UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

ROXANA C. SOSA,

                Plaintiff,

      -against-

NEW YORK STATE DIVISION OF HUMAN
RIGHTS, JOSE GONZALEZ, and JOYCE
YEARWOOD-DRURY,

              Defendants.
-----------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**11-CV-5155 (NGG) (VVP)**

NICHOLAS G. GARAUFIS, United States District Judge.

      Pro se Plaintiff Roxana Sosa brings this employment discrimination action against

Defendant New York State Division of Human Rights ("DHR") for violations of the

Rehabilitation Act of 1972, 29 U.S.C. § 791 et seq.[1] (See Compl. (Dkt. 1).) Sosa alleges that

DHR discriminated against her on the basis of disability when she was not promoted to an open

position at DHR and again when she was placed on leave and ultimately terminated. (Id.) She

further alleges that DHR failed to accommodate her disability and subjected her to a hostile work

environment. (Id.) With leave of the court (see Sept. 8, 2014, Order (Dkt. 68)), DHR moved for

summary judgment on all of Sosa's remaining claims (Not. of Mot. for Summ. J. (Dkt. 71)). For

the reasons discussed below, DHR's motion for summary judgment is GRANTED in its entirety.

---

[1] Sosa also brought claims against Jose Gonzalez and Joyce Yearwood-Drury, and claims under 42 U.S.C. § 1985.
Those claims were dismissed. (See Mar. 26, 2013, Mem. & Order (Dkt. 20).)

## I.    BACKGROUND

### A.    Factual Background

Except as otherwise noted, the following facts are undisputed. Where facts are in dispute, the court credits Sosa's version of the particular fact, if supported by record evidence.[2] The court has not included in this section facts introduced by the parties that are not material to Sosa's claims.

### 1.    Sosa's Employment History

In September 2001, Sosa was hired by DHR as a Human Rights Specialist I (Spanish Language). (Tr. of May 8, 2014, Dep. of Roxana C. Sosa ("Sosa Dep.") (Affirmation of Roxana C. Sosa in Opp'n of Def.'s Mot. for Summ. J. ("Sosa. Aff.") (Dkt. 79), Ex. D (Dkt. 79-4)) at 34:8-16.) On or about May 29, 2008, Sosa was provisionally promoted to the position of Human Rights Specialist II (HSR II) in DHR's Office of Sexual Harassment Issues ("OSHI"). (Def.'s Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("DHR's 56.1") (Dkt. 72) ¶ 3; Pl. Pro Se's Response to Def.'s Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Sosa's 56.1") (Dkt. 78) ¶ 3.)[3] Provisional employees are hired without taking a civil service exam and serve at-will, for a limited term. (DHR's 56.1 ¶ 4; Sosa's 56.1 ¶ 4.)[4]

---

[2] Because Sosa is proceeding pro se, the court has performed an independent review of the entire record submitted by the parties to determine whether there are disputed issues of material fact. See McClendon v. Cnty. of Nassau, No. 11-CV-0190 (SJF) (ETB), 2012 WL 4849144, at *2 (E.D.N.Y. Oct. 11, 2012); Williams v. City of New York, No. 06-CV-6601 (NGG), 2009 WL 3254465, at *1 n.1 (E.D.N.Y. Oct. 9, 2009). Likewise, the court will consider Sosa's filings to be sworn statements so long as they are otherwise admissible. See Washington v. William Morris Endeavor Entm't, LLC, No. 10-CV-9647 (PKC), 2014 WL 4401291, at *1 n.1 (S.D.N.Y. Sept. 5, 2014); Geldzahler v. N.Y. Med. Coll., 746 F. Supp. 2d 618, 620 n.1 (S.D.N.Y. 2010).

[3] It appears that Sosa served only one document labeled both her opposition and 56.1 statement. Because Sosa is appearing pro se, the court has construed this document liberally. Sosa's 56.1 statement contains multiple paragraphs designated paragraph three. Here, the court refers to the third paragraph labeled "three".

[4] Sosa's 56.1 statement contains multiple paragraphs designated paragraph four. Here, the court refers to the first and second paragraphs labeled "four."

2.    <u>Sosa's Injuries</u>

On September 30, 2008, Sosa slipped and fell outside of a bathroom at OSHI. (DHR's 56.1 ¶ 5; Sosa's 56.1 ¶ 5.)[5] Sosa suffered extensive injuries in the fall which led to headaches and blurred visions. (Employee Accident Report (Sosa Aff., Ex. E (Dkt. 79-5)) at 1-2; Comprehensive Initial Evaluation (Sosa Aff., Ex. F (Dkt. 79-6)) at 3-4.) On November 4, 2008, Sosa submitted an Employee Accident Report which was signed by her supervisor, Ms. Joyce Yearwood-Drury. (Employee Accident Report at 1-2.) On January 31, 2009, Sosa was involved in a car accident. (ExitCare Patient Information Dated Jan. 31, 2009 (Sosa Aff., Ex. G (Dkt. 79-7)) at 1.) The car accident exacerbated Sosa's symptoms. (Sosa Dep. (Affirmation of Michelle R. Lambert in Support of Def.'s for Mot. Summ. J. ("Lambert Aff.") (Dkt. 76), Ex. D (Dkt. 76-4)) at 81:16-19.)

Sosa's injuries required that she receive medical care and physical therapy multiple times per week and at various times throughout the day. (DHR's 56.1 ¶ 7; Sosa's 56.1 ¶ 7.) The parties contest the extent to which Sosa's medical condition was accommodated by DHR. (Compare DHR's 56.1 ¶ 8, <u>with</u> Sosa's 56.1 ¶ 8.) At this stage of the litigation, the court credits Sosa's evidence. Sosa's evidence indicates that because OSHI was understaffed, it was often difficult for Sosa to attend her medical appointments. (Sosa Dep. at 106:24-107:8, 183:18-25.) Nonetheless, Sosa was never denied leave to attend a medical appointment; indeed, it appears that each time she requested leave, it was approved. (Decl. of Joyce Yearwood-Drury in Support of Def.'s Mot. for Summ. J. ("Yearwood-Drury Decl.") (Dkt. 74) ¶ 13.) However, when Sosa used leave, Yearwood-Drury carefully scrutinized her time sheets (Sosa Dep. at 210:19-211:5; <u>see also</u> <u>id.</u> at 154:21-155:16 (indicating that Yearwood-Drury was less conscientious regarding

---

[5] Sosa's 56.1 statement contains multiple paragraphs designated paragraph five. Here, the court refers to the second paragraph labeled "five".

other employee's timesheets)), and was often late in approving Sosa's timesheets (id. at 207:10-14). In addition, on at least one occasion, Yearwood-Drury screamed at Sosa and accused her of not being truthful in her time reports. (Id. at 92:25-93:14.)

Sosa further claims that she was mistreated at OSHI. Specifically, Sosa claims that Yearwood-Drury sent Barbara Feldstein, another OSHI employee, to harass her (id. at 93:9-17, 122:16-25), and then refused to respond appropriately when Sosa complained about the harassment (id. at 154:8-155:25).

### 3. Sosa's Attempt to Become a Permanent HSR II

On or about October 16, 2010, Sosa took the civil service exam for a permanent HRS II position. (DHR's 56.1 ¶ 9; Sosa's 56.1 ¶ 9.) In January of 2011, the civil service list for the HRS II position was certified. (DHR's 56.1 ¶ 10; Sosa's 56.1 ¶ 10; List 36327, Human Rights Specialist 2 (Sosa Aff., Ex. S (Dkt. 79-19)) at 1-4.) Sosa scored an 80 on the exam. (DHR's 56.1 ¶ 11; Sosa's 56.1 ¶ 11.) Numerous candidates scored higher than Sosa, including multiple candidates who scored either a 95, 90, or an 85. (List 36327, Human Rights Specialist 2, at 1-4.)

By way of background, New York's Civil Service law provides that "[a]ppointment or promotion from an eligible list to a position in the competitive class shall be made by the selection of one of the three persons certified by the appropriate civil service commission as standing highest on such eligible list who are willing to accept such appointment or promotion." N.Y. Civ. Serv. Law § 61(1). Sosa argues that this particular appointment did not require the appointment of a candidate from the top three scoring candidates who were are willing to accept the appointment. (Sosa's 56.1 ¶ 12.) However, a reasonable jury could not so infer from any evidence in the record; the record evidence indicates that DHR debated how to treat candidates

4

who received the same exam score. (Mar. 11, 2011, Email from Jose Gonzalez to Jyll Townes (Sosa Aff., Ex. T (Dkt. 79-20)) at 1-2; Mar. 10, 2011, Email from Galen Kirkland to Jose Gonzalez (Sosa Aff., Ex. V (Dkt. 79-22)) at 2-3.) DHR did not consider candidates who received lower scores until there were fewer than three candidates remaining with higher scores. (Mar. 11, 2011, Email from Jose Gonzalez to Jyll Townes (Sosa Aff., Ex. T (Dkt. 79-20)); Decl. of Ali Jafri in Support of Def.'s Mot. for Summ. J. ("Jafri Decl.") (Dkt. 73) ¶¶ 11, 12.)

Sosa was not interviewed for the position at OSHI. (DHR's 56.1 ¶ 13; Sosa's 56.1 ¶ 13.) Sosa was not eligible because four candidates who ranked higher than her expressed interest in the position. (DHR's 56.1 ¶ 13; Jafri Decl.¶ 12.) Sosa contests that four candidates actually expressed interest; specifically, Sosa alleges that there is insufficient evidence that William Plotski was interested in the position. (Sosa's 56.1 ¶ 13.) Sosa has not presented evidence that raises a genuine issue of material fact regarding the number of employees who expressed interest in the position. Sosa claims that the evidence indicates Plotski was on a long-term leave of absence and therefore not interested in the position. (Id.) A rational jury could not make such an inference. Sosa's evidence indicates that five employees were on sick leave. (Aug. 31, 2011, Email from Jill Townes to Luis Burgos (Sosa Aff., Ex. U (Dkt. 79-21)).) But the record does not indicate that one of the five employees was Plotski; much less that Plotski was unwilling to return to work. (Id.)

Based on her score, Sosa was reachable—that is she was within the top three candidates—for an HRS II position at the Upper Manhattan Regional office because only two candidates with scores higher than hers expressed interest in that particular position. (Def.'s 56.1 ¶ 14; Sosa's 56.1 ¶ 14.) Sosa was interviewed for the position in March of 2011. (Def.'s 56.1 ¶ 15; Sosa's 56.1 ¶ 15.) All the interview questions were pre-planned and each candidate was

asked the same questions. (Yearwood-Drury Decl. ¶ 16; Decl. of David Powell in Support of Def.'s Mot. for Summ. J. ("Powell Decl.") (Dkt. 75) ¶ 4.) Sosa claims that she received insufficient notice of the interview and that Yearwood-Drury was "completely unprofessional" during the interview. (Sosa's 56.1 ¶ 15)[6]

Ultimately, Janne Linares was hired for the position. (DHR's 56.1 ¶ 16; Sosa's 56.1 ¶ 16.) Linares was hired upon the recommendation of David Powell, who had supervised Linares for more than two years in the Upper Manhattan Regional Office. (Id.) Conversely, Sosa's supervisor, Yearwood-Drury, did not recommend that Sosa be appointed to the position. (Sosa Dep. at 247:21-249:15.) At the time of the interview, Powell did not know about Sosa's disability. (DHR's 56.1 ¶ 17; Sosa's 56.1 ¶ 17.)

On March 31, 2011, DHR sent Sosa a letter informing her that because she did not score high enough on the HRS II exam, she was being reverted back to her permanent position as an HRS I (Spanish Language). (Sosa's 56.1 ¶ 19.)[7]

4. Sosa's Medical Leave

On April 1, 2011, Sosa called in sick and did not report to work. (DHR's 56.1 ¶ 20; Sosa's 56.1 ¶ 20.) On April 29, 2011, DHR approved Sosa for sick leave with half-pay. (DHR's 56.1 ¶ 21; Sosa's 56.1 ¶ 21.) Over the next several months, Sosa's sick leave was extended three times, through August 19, 2011. (DHR's 56.1 ¶ 22; Sosa's 56.1 ¶ 22.) On August 17, 2011, DHR sent Sosa a letter requesting that she submit to a medical examination; the examination was scheduled for August 25, 2011. (DHR's 56.1 ¶ 23; Sosa's 56.1 ¶ 23; Aug. 17, 2011, Letter (Jafri Decl. Ex. H (Dkt. 73-8)).) On August 24, 2011, DHR sent Sosa a

---

[6] Sosa's 56.1 statement contains multiple paragraphs designated paragraph fifteen. Here, the court refers to the second and third paragraphs labeled "fifteen".

[7] Sosa's 56.1 statement contains multiple paragraphs designated paragraph nineteen. Here, the court refers to the second paragraph labeled "nineteen".

letter rescheduling the medical examination for August, 31, 2011. (Aug. 24, 2011, Letter (Jafri Decl., Ex. I (Dkt. 73-9)).) Sosa did not attend the medical examination on the advice of her counsel. (Sosa's 56.1 ¶¶ 23, 24; Sosa Dep. at 12:6-14, 285:8-286-21.) On September 8, 2011, DHR sent Sosa a letter informing her that she had been placed on unauthorized leave without pay for failure to appear at the medical examination. (DHR's 56.1 ¶ 25; Sosa's 56.1 ¶ 25.) On September 3, 2013, Sosa received a letter from DHR which stated that her employment would be terminated if she did not appear at work on or before September 12, 2013. (Sosa's 56.1 ¶ 26; Jafri Decl. ¶ 27.) Sosa did not respond to the September 3, 2013, letter and did not return to work; accordingly, her employment was terminated. (Jafri Decl. ¶ 28.)

### B.    Procedural History

On October 21, 2011, Sosa filed the Complaint, alleging disability discrimination and harassment under the Rehabilitation Act against DHR, and conspiracy to interfere with civil rights against DHR, Gonzalez, and Yearwood-Drury. (Compl.) On June 15, 2012, Defendants moved to dismiss all of the claims. (Not. of Mot. (Dkt. 13).) The court denied Defendants' motion with respect to the Rehabilitation Act claim, but granted Defendants' motion and dismissed the conspiracy to interfere with civil rights claim. (Mar. 26, 2013, Mem. & Order (Dkt. 20).) On September 5, 2014, DHR sought leave to move for summary judgment. (Ltr. Mot. for Pre-Mot. Conf. (Dkt. 67).) The court granted DHR's request. (Sept. 8, 2014, Order.) Now before the court now is DHR's motion for summary judgment on Sosa's Rehabilitation Act claims.

## II.    LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). No genuine dispute of material fact exists if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the court "is required to construe the evidence in the light most favorable to the non-moving party and to draw all reasonable inferences in its favor." Trammell v. Keane, 338 F.3d 155, 161 (2d Cir. 2003); see also Anderson, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

The moving party bears the initial burden to show an absence of genuine factual dispute. See Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970). Summary judgment will be granted if the opposing party then "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To defeat summary judgment, the opposing party must do more than demonstrate "some metaphysical doubt as to the material facts," Matsushita, 475 U.S. at 586, and may not rely on "conclusory allegations," Twin Labs., Inc. v. Weider Health & Fitness, 900 F.2d 566, 568 (2d Cir. 1990). Where the party opposing summary judgment is proceeding pro se, the court must construe his filings liberally. See Ferran v. Town of Nassau, 471 F.3d 363, 369 (2d Cir. 2006).

## B.    Rehabilitation Act

The Rehabilitation Act provides in relevant part:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

29 U.S.C. § 794(a). "To establish a prima facie case under the Rehabilitation Act, a plaintiff must show: (1) he is handicapped or disabled under the Act; (2) he is otherwise qualified to perform his job; (3) he suffered an adverse employment action solely due to his disability; and (4) the employer is a recipient of Federal financial assistance." Gentile v. Potter, 509 F. Supp. 2d 221, 235 (E.D.N.Y. 2007); see also Fulton v. Goord, 591 F.3d 37, 43 (2d Cir. 2009). "To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Sanders v. N.Y.C. Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004) (internal quotation marks and citation omitted). "Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." Sethi v. Narod, 12 F. Supp. 3d 505, 523 (E.D.N.Y. 2014) (citing Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004)). Likewise, the failure to promote may be a materially adverse employment action. Mills v. S. Conn. State Univ., 519 F. App'x 73, 75 (2d Cir. 2013) (summary order).

Courts in this circuit routinely rely on jurisprudence under the Americans with Disabilities Act ("ADA") to inform their analysis under the Rehabilitation Act because "[a]part from the Rehabilitation Act's limitation to denials of benefits 'solely' by reason of disability and its reach of only federally funded—as opposed to 'public'—entities, the reach and requirements

9

of both statutes are precisely the same." Weixel v. Bd. of Educ. of City of N.Y., 287 F.3d 138, 146 n.6 (2d Cir. 2002); see also Logan v. Matveevski, 57 F. Supp. 3d 234, 254 (S.D.N.Y. 2014) ("These appear to be the only significant differences between the ADA and the Rehabilitation Act.").

>    1.    Discriminatory Treatment

Claims of intentional discrimination under the Rehabilitation Act are analyzed under the burden-shifting framework established by the Supreme Court in McDonnell Douglass Corp. v. Green, 411 U.S. 792 (1973). See Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 48-49 (2d Cir. 2002) superseded by statute on other grounds, ADA Amendments of 2008, Pub. L. No. 110-325, 122 Stat. 3553. Under the McDonnell Douglass framework, a plaintiff must first establish a prima facie case of discrimination. See City of Middletown, 294 F.3d at 49. In order to make out a prima facie case of intentional discrimination a plaintiff must demonstrate: (1) she is a handicapped person; (2) she is otherwise qualified to perform her job; (3) the adverse employment action was taken because of her handicap; and (4) the employer is a recipient of Federal funding. Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 722 (2d Cir. 1994); see also City of Middletown, 294 F.3d at 49 ("To establish a prima facie case of discrimination under the Rehabilitation Act, . . . the plaintiffs must show that the defendants [took an adverse employment action] 'solely' because of the disability.").

If a plaintiff can successfully make out a prima facie case, the burden of production then shifts to the defendant to "articulate (not prove), via admissible evidence, a legitimate reason for the employment decision." Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1180 (2d Cir. 1992); City of Middletown, 294 F.3d at 49. Finally, "[t]he plaintiffs must then prove that the defendants

intentionally discriminated against them on a prohibited ground." <u>City of Middletown</u>, 294 F.3d at 49.

   2. <u>Hostile Work Environment</u>

  "A hostile work environment claim arises 'when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" <u>Lucenti v. Potter</u>, 432 F. Supp. 2d 347, 361 (S.D.N.Y. 2006) (quoting <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993)). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive" does not rise to the level of a hostile work environment. <u>Harris</u>, 510 U.S. at 21. The Supreme Court has noted that "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances"; nonetheless, the court recognized that certain factors may guide the inquiry including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Id.</u> at 23.

  Accordingly, "hostile work environment claims present mixed questions of law and fact that are especially well-suited for jury determination." <u>Messer v. Fahnestock & Co. Inc.</u>, No. 03-CV-4989 (ENV) (JMA,) 2008 WL 4934608, at *8 (E.D.N.Y. Nov. 18, 2008) (internal quotation marks and citations omitted). Nonetheless, "it is the law of this Circuit that 'summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact.'" <u>Schiano v. Quality Payroll Sys., Inc.</u>, 445 F.3d 597, 608 (2d Cir. 2006) (quoting <u>McLee v. Chrysler Corp.</u>, 109 F.3d 130, 135 (2d Cir. 1997)).

3.    Reasonable Accommodation

Under the Rehabilitation Act, "an employer discriminates by, inter alia, not making a 'reasonable accommodation to the known physical or mental limitations' of an otherwise qualified employee, unless the employer can demonstrate that the accommodation would impose 'an undue hardship' on the operation of its program." Alenski v. Potter, 03-CV-2179 (SJF) (MLO), 2005 WL 1309043, at *14 (E.D.N.Y. May 18, 2005) (adopting report and recommendation) (quoting 45 C.F.R. § 84.12(a)). "Quite simply, the demonstration that a disability makes it difficult for a plaintiff to access benefits that are available to both those with and without disabilities is sufficient to sustain a claim for a reasonable accommodation." Henrietta D. v. Bloomberg, 331 F.3d 261, 277 (2d Cir. 2003).

"A 'reasonable accommodation' is one that gives the otherwise qualified plaintiff with disabilities 'meaningful access' to the program or services sought." Id. at 282 (quoting Alexander v. Choate, 469 U.S. 287, 301 (1985)). "Whether a requested accommodation is required . . . is highly fact-specific, requiring case-by-case determination." Logan v. Matveevskii, 57 F. Supp. 3d 234, 256 (S.D.N.Y. 2014) (alteration in original) (citing Freeland v. Sisao LLC, No. 07-CV-3741 (CPS) (SMG), 2008 WL 906746, at *3 (E.D.N.Y. Apr. 1, 2008)). "[A]n accommodation is reasonable only if its costs are not clearly disproportionate to the benefits that it will produce." Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 138 (2d Cir. 1995).

III.    DISCUSSION

A.    Discriminatory Treatment

A generous reading of the Complaint and Sosa's 56.1 statement reveals four potential adverse employment events: (1) DHR's failure to promote Sosa to the OSHI HRS II position; (2)

12

DHR's failure to promote Sosa to the Upper Manhattan Regional Office HRS II position; (3) Sosa's reversion to an HRS I position; and (4) Sosa's placement on unpaid leave. The court examines each in turn.[8]

        1.    OSHI HRS II Position

DHR argues that Sosa cannot make out a claim for discriminatory treatment with regard to the OSHI position because "by law, Plaintiff was not qualified for the position" and because four interested individuals scored higher. (Mem. in Support of Def.'s Mot. for Summ. J. ("DHR's Mem.") (Dkt. 77) at 11.)

The court agrees; a reasonable jury could not find that Sosa was denied the HRS II position at OSHI solely because of her disability for two reasons: (1) she is not qualified for the OSHI HRS II position, and (2) there is no evidence that Sosa was more qualified than the individual who was hired.

"The Second Circuit [has held] that in determining whether a plaintiff has met his prima facie burden of demonstrating he was qualified for a position, 'being qualified refers to the criteria the employer has specified for the positions,' and a plaintiff's subjective belief he is qualified will not suffice." Workneh v. Pall Corp., 897 F. Supp. 2d 121, 131 (E.D.N.Y. 2012) (quoting Williams v. R.H. Donnelly Corp., 369 F.3d 123, 127 (2d Cir. 2004)). By operation of state law, Sosa could not be hired as an HRS II at OSHI, see N.Y. Civil Service Law § 61, because four individuals with higher scores than Sosa were interested in the position (Jafri Decl. ¶ 12); see also supra Part I.A.3. Accordingly, Sosa was not an otherwise qualified individual. See Hall v. N.Y.C. Dep't of Transp., 701 F. Supp. 2d 318, 334 (E.D.N.Y. 2010) (dismissing a failure to promote claim where the plaintiff was not qualified under the New York Civil Service

---

[8] For the purposes of this motion, DHR does not contest that Sosa is disabled under the Rehabilitation Act, or that DHR receives federal funding. (Mem. in Support of Def.'s Mot. for Summ. J. (Dkt. 77) at 9 n.9.)

Law); As-Salaam v. N.Y.C. Dep't of Parks & Recreation, No. 02-CV-5646 (ENV) (LB), 2007

WL 2126262, at *6 (E.D.N.Y. July 24, 2007) ("Crucially, As-Salaam fails even to offer proof

that he was legally 'qualified' for the position. Indeed, his own recitation of the facts establishes

conclusively that, as a result of his own reckless disregard of work-related mail, he failed to

complete the requirements for permanent competitive appointment to the Civil Service position

of climber and pruner he had provisionally held and, as a matter of New York public law, was

therefore no longer 'qualified' to keep his position upon the appointment of a certified candidate

to fill it."); cf. Manessis v. N.Y.C. Dep't of Transp., No. 02-CV-359 (SAS), 2003 WL 289969,

at *10 (S.D.N.Y. Feb. 10, 2003) (noting that plaintiff was not similarly situated to individuals

who were reachable on the civil service list), aff'd sub nom. Manessis v. Chasin, 86 F.

App'x 464 (2d Cir. 2004) (summary order).[9]

Even if Sosa could show that she was qualified (i.e. that she should have been reachable

on the list) she could still not make out a prima facie case because there is no evidence that Sosa

was more qualified than—or even as qualified as—Roberto Chavez, the candidate who was

ultimately hired.

In the failure-to-promote context, a comparison of the plaintiff's qualifications to those of

the promoted employee is appropriate at the prima facie stage. See Anyanwu v. City of New

York, No. 10-CV-8498 (AJN) (THK), 2013 WL 5193990, at *14 (S.D.N.Y. Sept. 16, 2013)

(surveying failure-to-promote case law and explaining that "the Second Circuit appears to

require at least some comparison of the plaintiff's qualifications with those of the promoted

employee(s) at the prima facie stage." (citing Mandell v. Cnty. of Suffolk, 316 F.3d 368, 379

(2d Cir. 2002); Terry v. Ashcroft, 336 F.3d 128, 139 (2d Cir. 2003)). But see, e.g., Byrnie v.

---

[9] This is not to say that the exam process is insulated from review under federal civil rights law. Indeed, it is a cognizable claim under the civil rights statutes that an exam is itself discriminatory. Here, however, Plaintiff has not alleged that the HRS II examination was discriminatory in any way.

Town of Cromwell, 243 F.3d 93, 103 (2d Cir. 2007) (holding, in failure-to-hire context, that plaintiff established prima facie case of age discrimination by showing only that "[h]e was a 64 year old male job applicant who . . . was eminently qualified for the art teacher position that [defendant] awarded to [a] 42 year old female . . . .") As the Anyanwu court explained:

> Indeed, comparing qualifications at the prima facie stage makes intuitive sense, because selecting another employee for promotion instead of the plaintiff involves choosing among multiple candidates. The mere fact that the plaintiff was qualified for the job—which is established as the second element of the prima facie case—says nothing about which candidate was more qualified. As a logical matter, only if a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, [can] the factfinder . . . legitimately infer that the employer consciously selected a less-qualified candidate— something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture.

2013 WL 5193990, at *15 (alterations and emphases in original) (internal quotation marks and citation omitted). Here, the record reflects that Sosa was less qualified for the HRS II position than Chavez—indeed, the only evidence in the record is that Chavez scored better than Sosa on the civil service exam. See, e.g., id. at *17 (plaintiff established prima facie case with respect to particular promotion where he showed that four employees selected over him for the promotion did not hold a relevant license held by plaintiff and were therefore less qualified for the position); Gonzalez v. City of New York, 354 F. Supp. 2d 327, 335 (S.D.N.Y. 2005) (plaintiffs failed to establish prima facie case at summary judgment in failure-to-promote action where they offered no evidence that individuals who were promoted in their place were less qualified).

## 2.    Upper Manhattan Regional Office HRS II Position

Similarly, Sosa cannot make out a prima facie claim that she was denied a promotion to the Upper Manhattan Regional Office HRS II position because of her disability. As with the

OSHI position, the record is devoid of any evidence that Linares, the candidate selected for the position, was less qualified than Sosa. True, Linares and Sosa scored the same on the civil service exam; but this does not end the analysis. (Jafri Decl. ¶ 12.) Linares had already worked for Powell, the supervisor of the Upper Manhattan Regional Office, as a provisional HRS II, and he believed that she "performed exceptionally." (Powell Decl. ¶ 6.) Accordingly, following the interview, Powell—who did not know that Sosa was disabled (DHR's 56.1 ¶ 17; Sosa's 56.1 ¶ 17)—concluded that "Linares was best suited for the HRS II position" (Powell Decl. ¶ 8). Sosa cannot make out a prima facie case on such a record. See Gonzalez v. City of New York, 354 F. Supp. 2d 327, 335 (S.D.N.Y. 2005).

The court additionally finds that Yearwood-Drury's allegedly unprofessional behavior during the interview is insufficient to support at prima facie claim. Because the hiring decision was made on the basis of Powell's knowledge of Linares's work, Sosa has not raised a genuine issue of material fact indicating that Yearwood-Drury's allegedly unprofessional interview behavior played any role in her not being promoted to the Upper Manhattan Regional Office position.

Even if Sosa could make out a prima facie case, Sosa has not adduced any evidence that she was not promoted solely because of her disability. Sosa's theory appears to be that she was denied the position because Yearwood-Drury refused to recommend her. Even accepting that Yearwood-Drury's recommendation would have been dispositive, Sosa has not shown that Yearwood-Drury refused to give a recommendation because Sosa was disabled. Indeed, the record belies such a claim; Yearwood-Drury did not make recommendations for open positions outside her office, the OSHI. (Yearwood-Drury Decl. ¶ 17.) Additionally, even if Yearwood-Drury would normally have made a recommendation, the record indicates ample neutral reasons

why she would not have recommended Sosa. In fact, Sosa admitted that she had "had disagreements" with Yearwood-Drury (Sosa Dep. at 248:24-249:3), and that Yearwood-Drury had questioned Sosa's managerial style (id. at 154:19-155:3).

Sosa's allegation that she received insufficient notice of her interview cannot revive her claim. The record contains no evidence indicating that Sosa's notice was delinquent compared to other candidates. Even assuming that Sosa did receive comparatively late notice, Sosa has failed to adduce any evidence that she received late notice because of her disability. Indeed, there is no indication that individuals who knew of Sosa's disability played any role in her receiving notice regarding the interview. On such a record, Sosa has not carried her burden of adducing evidence sufficient to create a genuine issue of material fact.

### 3. Reversion to HRS I

DHR argues that Sosa's reversion to her HRS I position was not discriminatory because it was required as a matter of state law. (DHR's Memo at 11.)

The court concurs. It is undisputed that Sosa only held her HRS II position provisionally. (DHR's 56.1 ¶ 3; Sosa's 56.1 ¶ 3.) It is likewise undisputed that in January 2011, a civil service list was certified for the HRS II position. (DHR's 56.1 ¶ 10; Sosa's 56.1 ¶ 10.) New York's Civil Service Law provides "[a] provisional appointment to any position shall be terminated within two months following the establishment of an appropriate eligible list for filling vacancies in such positions . . . ." N.Y. Civ. Serv. Law § 65(3). Accordingly, Sosa was required to be reverted to her permanent position under New York law. (Mar. 31, 2011, Letter to Roxana Sosa (Jafri Decl. Ex. C (Dkt. 73-3)).)

Reversion pursuant to Civil Service Law § 65 is both legitimate and non-discriminatory. See, e.g., Valcin v. N.Y.C. Dep't of Homeless Servs., No. 07-CV-1385 (DAB) (KNF), 2009

17

WL 3094873, at *6 (S.D.N.Y. Sept. 24, 2009) (report and recommendation) ("Inasmuch as the plaintiff had not taken the civil service examination, New York law required that DHS terminate her employment to fill her position with a qualified candidate from the eligible list. Accordingly, the defendant has met its burden of production by demonstrating a legitimate, non-discriminatory reason for Valcin's termination existed.") adopted, 2010 WL 1257603 (S.D.N.Y. Mar. 30, 2010); As-Salaam, 2007 WL 2126262, at *6 ("Quite simply, a provisional appointee is not permitted by law to hold a position in the civil service to the exclusion of a duly qualified candidate for that position certified from the corresponding civil service eligibility list. In the absence of any indicia of discrimination whatsoever, the Court cannot find As-Salaam has demonstrated, even prima facie, that his statutorily mandated termination from the provisional position of climber and pruner was in violation of Title VII."); Cabrera v. City of New York, 436 F. Supp. 2d 635, 645 (S.D.N.Y. 2006) ("It is undisputed that after the establishment of the civil service list all provisional employees in Cabrera's title at Bellevue, regardless of age, race, or national origin, were terminated in reverse seniority order with the most junior employees being terminated first. All of the individuals who replaced the provisional employees were appointed from the established civil service list. As every provisional PAA had their provisional employment terminated, Cabrera has not established that her termination occurred under circumstances giving rise to an inference of discrimination."); Wheeler v. Natale, 137 F. Supp. 2d 301, 305 (S.D.N.Y. 2001) ("Since plaintiff concedes that she did not pass the test and was therefore not listed upon the appropriate Civil Service list, plaintiff's employment, as a matter of law, had to come to an end. Plaintiff did not qualify for the Civil Service job, so she cannot allege a failure to hire, or 'adverse employment action' against the defendants as a result of this decision.")

4.    Unpaid Leave

DHR has proffered a legitimate non-discriminatory basis for its decision to terminate

Sosa (DHR's Memo at 15); namely, Sosa was not entitled to leave without taking a required

medical examination. (See Sept. 8, 2011, Letter to Roxana Sosa (Jafri Decl. Ex. J

(Dkt. 73-10)).)[10]  Sosa was required to attend the health examination under New York law.[11]

N.Y. Comp. Codes R. & Regs. tit. 4, § 21.3 ("The appointing authority may require such proof

of illness as may be satisfactory to it, or may require the employee to be examined, at the

expense of the department or agency, by a physician designated by the appointing authority.")

Indeed, Sosa was repeatedly informed that she was required to submit evidence substantiating

the basis for her medical leave of absence (see, e.g., Apr. 29, 2011, Letter to Roxana Sosa (Jafri

Decl. Ex. D (Dkt. 73-4)); May 18, 2011, Letter to Roxana Sosa (Jafri Decl. Ex. E (Dkt. 73-5));

June 23, 2011, Letter to Roxana Sosa (Jafri Decl. Ex. F (Dkt. 73-6)); July 14, 2011, Letter to

Roxana Sosa (Jafri Decl. Ex. G (Dkt. 73-7))), and that she was required to attend a medical

examination (Aug. 24, 2011, Letter to Roxana Sosa (Jafri Decl. Ex. I (Dkt. 73-9))).  When Sosa

failed to attend the medical examination, New York law permitted DHR to consider her absence

---

[10] Sosa does not appear to challenge that the medical examination itself was unlawful.  The ADA requires that for an agency to permissibly require a medical examination of an employee, it must show that the examination is job-related and consistent with business necessity.  Krishnapillai v. Donahoe, No. 09-CV-1022 (NGG) (SMG), 2013 WL 5423724, at *18 (E.D.N.Y. Sept. 26, 2013).  "[B]usiness necessities may include . . . cutting down on egregious absenteeism."  Conroy v. N.Y. Dep't of Corr. Servs., 333 F.3d 88, 97-98 (2d. Cir. 2003).  "The employer need not show that the examination or inquiry is the only way of achieving a business necessity, but the examination or inquiry must be a reasonably effective method of achieving the employer's goal."  Id. at 98.  Here, Sosa had been on half pay leave for over four months when DHR ordered a medical examination.  DHR had a legitimate interest in verifying Sosa's medical condition at that point to determine what, if any, accommodation was required.  See Delson v. Mineta, 144 F. App'x 136, 138 (2d Cir. 2005) (summary order) ("In seeking to determine the extent and types of accommodation that were truly necessary for plaintiff, the defendant's inquiries were 'job-related and consistent with business necessity.'") (citation omitted).

[11] The court notes that the referral to the medical examination itself is not a materially adverse employment event.  Dimitracopoulos v. City of New York, 26 F. Supp. 3d 200, 213 (E.D.N.Y. 2014) (finding that a "one-time referral to an involuntary medical examination is not grounds for a claim of age discrimination . . ."); Kane v. Carmel Cent. Sch. Dist., No. 12-CV-5429 (VB), 2014 WL 7389438, at *8 (S.D.N.Y. Dec. 15, 2014) ("After plaintiff fell getting into her car, the District was certainly entitled to require plaintiff to undergo a Section 913 examination.  Requiring plaintiff to submit to a medical examination the District is statutorily empowered to mandate does not materially alter the terms and conditions of plaintiff's employment, and is not more disruptive than a mere inconvenience.").

"as unauthorized leave", which cannot be counted as sick leave. N.Y. Comp. Codes R. & Regs. tit. 4, § 21.3. Accordingly, DHR was permitted to place Sosa on an unpaid leave of absence for a period of up to two years. Id. § 21.1. This is precisely what DHR did. (Sept. 3, 2013, Letter to Roxana Sosa (Jafri Decl. Ex. K (Dkt. 73-11)).)

DHR's decision to place Sosa on unpaid leave after she failed to appear at a required medical examination was legitimate and non-discriminatory. See Johnson v. Goodwill Indus. of E. N.C., Inc., No. 97-CV-740 (BR), 1998 WL 1119856, at *4 (E.D.N.C. Dec. 17, 1998) ("Several courts have held that an employee's refusal to submit to a job-related medical exam is proper grounds for termination.")

Sosa responds that she did not refuse the medical examination, but instead relied on the advice of her counsel who informed her that she did not need to attend the examination. (Sosa's 56.1 ¶¶ 23, 24; Sosa Dep. at 12:6-14, 285:8-286-21.) This argument misses the mark. The question the court needs to answer is not whether Sosa had valid grounds to miss the medical examination, but whether the employer's decision to place her on unpaid leave and then terminate her employment was discrimination solely based on her disability. Sosa may well have had a valid reason for missing the medical examination, but absent evidence that Sosa was discriminated against because of her disability, those reasons are irrelevant. There is simply no record evidence that suggests that DHR's decision to place Sosa on involuntary leave and then terminate her employment was pretextual.

**B.    Hostile Work Environment**

"To withstand summary judgment, a plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." Solomon v. Southampton

20

Union Free Sch. Dist., 504 F. App'x 60, 61 (2d Cir. 2012) (summary order) (quoting Feingold v. New York, 366 F.3d 138, 149-50 (2d Cir. 2004).)

Here, interpreting the record in a light most favorable to Sosa, the following events could arguably form part of the basis for a hostile work environment claim: (1) Sosa was "frequently" unable to leave her office and forced to cancel medical appointments because she was required to supervise the office (Sosa's 56.1 ¶ 8; Sosa Dep. at 211:2-5); (2) OSHI remained understaffed despite Sosa's requests for help (id. at 183:18-25); (3) Yearwood-Drury failed to submit Sosa's timesheet in a timely manner (id. at 207:8-208:24); (4) Yearwood-Drury accused Sosa of "nickel and diming" the timesheets of one of Sosa's inferiors (id. at 154:13-155:3); (5) Feldstein—another OSHI employee—brandished a stapler at Sosa (id. at 199:12-21); (6) Yearwood-Drury did not sufficiently respond when Sosa alleged that Feldstein was harassing her (id. at 122:16-25); (7) Yearwood-Drury inquired into Sosa's timesheets (id. at 208:7-22); (8) Yearwood-Drury accused Sosa of not being honest about her disability (id. at 92:25-93:14); (9) Yearwood-Drury allowed her cell phone to ring, laughed, and conversed during Sosa's HRS II interview (Sosa's 56.1 ¶15).

On this evidence, a reasonable jury could not find in Sosa's favor for two reasons: first, she has not linked any hostility to her disability, and second, any remaining allegations are simply not severe or pervasive enough to create an objectively hostile or abusive work environment.

It is "axiomatic" that in order to establish a claim of hostile work environment, a plaintiff must link the hostile conduct to her protected class. Alfano v. Constello, 294 F.3d 365, 374 (2d Cir. 2002). This does not mean that a plaintiff needs direct evidence that her protected status was the cause of each discreet injustice. "Facially neutral incidents" may be considered as part

21

of a hostile work environment claim "so long as a reasonable fact-finder could conclude that they were, in fact, based on [the protected status]. But this requires some circumstantial or other basis for inferring that incidents [ability]-neutral on their face were in fact discriminatory." Id. at 378. In the end, "a fact-finder may consider only abusive conduct proven to be" based on disability. Pucino v. Verizon Wireless Commc'ns, Inc., 618 F.3d 112, 117 (2d Cir. 2010). For much of the hostile conduct Sosa alleges, there is simply no nexus between the alleged hostility and her disability.

As a preliminary matter, Sosa has not put forth direct evidence of discrimination on the basis of disability. Arguably, the closest she gets to alleging that OSHI was a hostile work environment for individuals with disability is her claim that Yearwood-Drury disparaged another disabled employee named Cynthia. (Sosa Dep. at 111:10-21.) But even there, Sosa concedes, "I don't know if shy [sic] knows of any disability that Cynthia may have . . . ." (Id. at 111:11-13.) Sosa has not adduced direct evidence of discrimination with regard to any other of the allegedly hostile conduct.

Nor has Sosa adduced circumstantial evidence that facially neutral conduct was related to her disability. For example, Sosa alleges that Yearwood-Drury did not appropriately respond when Feldstein threatened her; but Sosa testified also that Yearwood-Drury's response "doesn't tie into the disability." (Id. at 200:6-8.) Additionally, Sosa testified that despite their disagreements, Yearwood-Drury was "always fair" to her. (Id. at 248:24-249:3.) Likewise, the record contains no evidence that Feldstein threatened Sosa with a stapler because of her disability. Instead, Sosa herself stated that Feldstein was known to have behavioral issues. (Id. at 122:16-25, 199:16-22.) Moreover, when asked if she believed that Feldstein's conduct was related to her disability, all Sosa could state was that Feldstein knew that she had fallen. (Id.

22

at 199:25.) Sosa's own speculation is an insufficient nexus to make out a hostile work environment claim.

Even if Sosa had adduced evidence that her mistreatment was linked to her disability, her allegations are simply not objectively substantial enough to constitute a hostile work environment.

Many of Sosa's allegations reduce down to a claim that Yearwood-Drury subjected her to intense scrutiny, for example, by questioning her injury and timesheets. Claims of intense scrutiny, even when coupled with additional conduct, have been found insufficient to create a hostile work environment. Nugent v. St. Lukes-Roosevelt Hosp. Ctr., 303 F. App'x 943, 945 (2d Cir. 2008) (summary order). Moreover, Sosa admitted that reviewing timesheets for accuracy was part of a supervisor's job at OSHI and could take a substantial amount of time. (Sosa Dep. at 155:5-16.) Sosa's claims that Yearwood-Drury stood by as other employees harassed Sosa are belied by the record. Sosa testified that "she had verbal warnings in front of me, but I felt that it should have been taken a step further, and I don't know if Joyce ever did that." (Id. at 123:18-22.) Finally, Sosa's allegation that Yearwood-Drury was rude during her HRS II interview is not severe enough to make out a claim for a hostile workplace. See Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (noting that anti-discrimination law should not be read so broadly to create a "general civility code").

Accordingly, the court finds that a reasonable jury could not find in Sosa's favor on her hostile work environment claim.

### C.    Reasonable Accommodation

In order to make out a prima facie case of failure to accommodate a plaintiff must show: "(1) [P]laintiff is a person with a disability . . . ; (2) an employer covered by the statute had

notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 97 (2d Cir. 2009) (quoting Graves v. Finch Pruyn & Co., 457 F.3d 181, 184 (2d Cir. 2006)). Sosa cannot make out a prima facie claim of failure to accommodate.[12]

Sosa admitted in her deposition testimony that with one exception all of her requests for accommodation were granted.

> Q: Were there any instances where you requested some type of accommodation and didn't get the assistance you requested?
>
> A: I think the only time that I could think of that she was going to give me a hard time that month that I asked, February 2009 that month that I had asked for the month off, and it was granted to me as workers compensation leave. So she – in two instances where I had to send her a letter asking her to use whatever unused vacation or unused sick leave for giving her permission to go on the computer and use it up because of the month that I am taking off, she was quite derogatory and --- in saying that she didn't think that I was being truthful, and that I am up to something.

(Sosa Dep. (Rebuttal Affirmation of Michelle R. Lambert in Support of Def.'s Mot. Summ. J. (Dkt. 81), Ex. F (Dkt. 81-2) at 192:3-21.) Even if Yearwood-Drury was less than forthcoming in granting Sosa's request to take off February of 2009, her leave was ultimately granted. (Id. at 92:25-93:4 ("I remember in February of 2009 when I was out for a month.").)[13] Sosa's admission that all of her requested accommodations were granted is supported by the remainder of the record. For instance, Sosa occasionally asked Yearwood-Drury for help because she was not feeling well. (Id. at 191:11-24.) In each instance, Sosa testified that Yearwood-Drury would

---

[12] Defendants argue that the failure to accommodate claim was not properly raised. (Reply Mem. in Further Support of Def.'s Mot. for. Summ. J. (Dkt. 80) at 7-8.) The court need not reach this question because of its disposition on the merits.

[13] Sosa appears to have asked for an in-office printer as well. (See Feb. 5, 2009, Fax from Sosa to Yearwod-Drury (Sosa Aff. Ex. Q (Dkt. 79-17)0 at 2.) This request was explicitly framed as an alternative request to receiving leave. As explained above, Sosa was granted leave in February 2009.

help. (<u>Id.</u> at 191:24-192-2.)  Accordingly, Sosa cannot make out a claim for failure to accommodate.

**IV.    CONCLUSION**

For the reasons stated above, DHR's motion for summary judgment is GRANTED and all claims against DHR are DISMISSED WITH PREJUDICE.  The Clerk of Court is respectfully directed to enter judgment and to close the case.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
      September **3**, 2015

NICHOLAS G. GARAUFIS
United States District Judge